

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

Signed February 15, 2013

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Chapter 11 |
| PIONEER AUSTIN EAST | § | Case No. 10-30177-HDH-11 |
| DEVELOPMENT I, LTD. | § | |
| | § | |
| Debtor. | § | |
| | § | |
| PIONEER AUSTIN EAST | § | |
| DEVELOPMENT I, LTD. | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | |
| PIONERG, LLC, GRENCORP | § | Adversary No. 10-03199-HDH |
| MANAGEMENT, INC., and | § | |
| 20/20 MANAGEMENT COMPANY, INC. | § | |
| | § | |
| Defendants. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. **Findings of Fact**

1. Pioneer East, the plaintiff and debtor (the "Debtor"), is a Texas limited partnership with its principal place of business in Dallas, Texas.

2. Defendant Pionerg, LLC ("Pionerg" or "Defendant Pionerg") is a limited liability company organized under the laws of the State of Texas with its principal place of business in Dallas, Texas.

3. Defendant Grencorp Management, Inc. ("Grencorp" or "Defendant Grencorp") is a corporation organized under the laws of the Province of Alberta with its principal place of business in Calgary, Alberta.

4. Defendant 20/20 Management Company, Inc. ("20/20 Management" or "Defendant 20/20 Management") is a corporation organized under the laws of the State of Texas with its principal place of business in Dallas, Texas.

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6. The parties have consented to this Court's determination and have waived their rights to have this matter tried by an Article III Court. In the event that a reviewing court finds this waiver inadequate, then this Court submits these findings as proposed. *See* 28 U.S.C. § 157(c)(1).

7. On or about October 2003, the Debtor, as borrower, entered into a series of financing transactions related to the Debtor's acquisition of 230 acres, more or less, of raw land located in Travis County, Texas.

8. The purchase of 230 acres was financed by multiple lenders. The purchase of two large

tracts of 86.326 acres ("86-Acre Tract") and of 110.279 acres ("110-Acre Tract") was for the most part financed with a first priority mortgage loan of $9,200,000 from Bank One ("Bank One Loan"). The Bank One Loan was secured by a first-lien deed of trust against the 86-Acre Tract and the 110-Acre Tract ("Bank One Deed of Trust"). The remaining balance of the Bank One Loan is now held by the Defendant Pionerg.

9.  An affiliate of the Debtor, Pioneer Austin Development IC, Ltd., a separate Texas Limited Partnership ("PAEDIC"), was also involved in these transactions. PAEDIC purchased 113 acres of land in several tracts adjacent to the land purchased by the Debtor (collectively, such tracts are referred to as the "113-Acre Tract"), borrowing the sum of $1,200,000 from a company named Pioneer Crossing Lender, LLC, to finance such transactions.

10. TOM 2003-1 Master Limited Partnership, an Alberta limited partnership ("TOM Capital"), provided a loan in the amount of $1,820,000 to Debtor (the $1,820,000 Loan") in these transactions. The $1,820,000 Loan was evidenced by two promissory notes, one made by the Debtor as maker payable to the order of TOM Capital in the original principal amount of $1,820,000 (the "Debtor $1,820,000 Note"), and one made by PAEDIC as maker payable to the order of TOM Capital in the original principal amount of $1,820,000 (the "PAEDIC $1,820,000 Note"). These two notes evidenced the same indebtedness, and the two notes expressly provided that any payment on one was a payment on the other.

11. As security for the $1,820,000 Debtor Note, the Debtor executed and delivered a Deed of Trust in favor of TOM Capital. The Deed of Trust created a second lien on all 230 acres acquired by the Debtor (the "$1,820,000 Debtor DOT"). As security for the $1,820,000 PAEDIC Loan, PAEDIC signed a Deed of Trust in favor of TOM Capital (the "$1,820,000

PAEDIC DOT"). The $1,820,000 PAEDIC DOT covered the 113-Acre Tract.

12. Another affiliate of the Debtor, Pioneer Austin Development, Ltd., a Texas limited partnership ("PAD"), was also involved in these transactions. PAD borrowed the sum of $1,414,000 from two lenders, secured by two tracts of land owned by PAD (the "PAD Third-Party Loans").

13. At this closing, PAD, PAEDIC, the Debtor and TOM Capital agreed to record the transfer of $1,414,000 in funds from PAD to PAEDIC, as if two things had happened: 1) PAD had repaid that same sum on an unrelated pre-existing debt it owed to TOM Capital (the "Unrelated PAD Loan") and 2) TOM Capital had transferred those funds to the Debtor and PAEDIC jointly. According to the agreement, a $1,414,000 payment was recorded on TOM capital's books, thereby decreasing its notes receivable account for the Unrelated PAD Loan. Additionally, a new loan was booked in the amount of $1,414,000, thereby increasing TOM Capital's notes receivable by adding a loan to the Debtor and PAEDIC jointly. Although these accounting entries resulted in different names on TOM Capital's notes receivable accounts, the entries did not impact the total assets figure on TOM Capital's balance sheet. As a result of these transactions, Debtor as maker executed a note payable to the order of TOM Capital in the original principal amount of $1,414,000 (the "Debtor $1,414,000 Note"), and PAEDIC as maker executed a note payable to the order of TOM Capital in the original principal amount of $1,414,000 (the "PAEDIC $1,414,000 Note"). These two notes evidenced the same indebtedness, and the two notes expressly provided that any payment on one was a payment on the other.

14. The Debtor executed and delivered a Deed of Trust, favoring TOM Capital, to secure the

Debtor $1,414,000 Note, which created a lien on all 230 acres acquired by the Debtor in the transaction (the "$1,414,000 Debtor DOT"). Securing the $1,414,000 PAEDIC Note, PAEDIC signed a Deed of Trust that covered the 113-Acre Tract in favor of TOM Capital (the "$1,414,000 PAEDIC DOT").

15. At the closing of these transactions, TOM Capital entered into a Subordination Agreement ("Bank One Subordination Agreement").

16. On July 28, 2004, 20/20 Management funded the sum of $577,535 to TOM Capital, and those sums were applied to the $1,820,000 Loan. 20/20 Management advanced the funds under the mistaken understanding that it was purchasing an interest in the $1,820,000 Loan.

17. In December of 2005, PAEDIC conveyed 73 acres out of the 113-Acre Tract to the Debtor. At the time of such conveyance, the prepetition Debtor had actual knowledge of both the $1,820,000 Loan and the $1,414,000 Loan, together with the $1,820,000 Deed of Trust and the $1,414,000 Deed of Trust.

18. With the Debtor's knowledge and consent, TOM Capital assigned its interests in the $1,820,000 Loan, the $1,414,000 Loan and the related notes and liens to Grencorp.

19. In June of 2006, PAEDIC repaid the PAD Third-Party Loans taken out in October of 2003. PAEDIC obtained the funds to repay the PAD Third-Party Loans by borrowing money from Liberty Bankers Life Insurance Company ("Liberty Bankers Life Loan").

20. In August of 2007, Grencorp recorded the $1,820,000 PAEDIC DOT and the $1,414,000 PAEDIC DOT. These instruments covered, *inter alia*, the 40-Acre Tract.

21. On or about December 23, 2009, Pionerg purchased the Bank One Loan.

22. Grencorp posted substantially all of the Debtor's real property for a foreclosure sale to take

place on January 5, 2010.

23. Debtor filed bankruptcy on January 4, 2010, but PAEDIC did not file bankruptcy.

24. Grencorp foreclosed on the 40-Acre Tract owned by PAEDIC on January 5, 2010, under the $1,820,000 PAEDIC DOT, and Pioneer 40, LLC bid in the 40-Acre Tract at such foreclosure sale for $10,000. At the time of the foreclosure there was a dispute regarding the liens on the 40 acres. That dispute was subsequently resolved in Grencorp's favor in a Motion for Summary Judgment.

25. At the date of the foreclosure sale, the fair market value of the 40-Acre Tract was $2,000,000 less rollback taxes estimated to be $140,000 or less.

**B. Conclusions of Law**

1. According to the Texas Supreme Court, agreements covering real estate liens or mortgages are unenforceable if not set forth in writing. *See West v. First Baptist Church of Taft,* 123 Tex. 388, 71 S.W.2d 1090, 1100 (Tex. 1934). Also, the Texas Courts of Appeal have held "that agreements concerning mortgages or a lien on real estate are 'within the statute of frauds, and must be in writing to be enforceable.'" *In re De La Fuente*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) (quoting *Khoshnoudi v. Bird,* No. 05-98-00388-CV, 2000 Tex. App. LEXIS 5579, 2000 WL 1176587, at *5 (Tex. App.--Dallas 2000, no pet.); *see also Edward Scharf Assocs., Inc. v. Skiba*, 538 S.W.2d 501, 502 (Tex. Civ. App.--Waco 1976, no writ) (holding that a real estate loan agreement is unenforceable if not in writing because such an agreement falls within the statute of frauds).

2. The Debtor $1,414,000 Note, held by Grencorp, has not been repaid in full or discharged. Payments made by PAEDIC towards the PAD Third-Party Loans had no legal consequences

with respect to the Debtor's liability under the Debtor $1,414,000 Note. The record did not establish an agreement to change the arrangement between the parties. They discussed it.[1] However, if the parties agreed that the Debtor $1,414,000 Note would be discharged upon payment on the PAD Third-Party Loans, that agreement was not evidenced in writing. For example, there is no note, deed of trust, memorandum or loan agreement evidencing a new arrangement. Because the credible evidence offered at trial failed to show that the Debtor $1,414,000 Note was paid in full or discharged, it remains due and payable by the Debtor. According to the credible evidence, Grencorp is the current and rightful noteholder. Therefore, the Debtor is obligated to Grencorp under the Debtor $1,414,000 Note.

3. As holder of the Debtor $1,820,000 Note, Grencorp is entitled to payment of a deficiency credited after the foreclosure on the 40-Acre Tract, but the Debtor is entitled to an offset pursuant to Texas Property Code Sections 51.003 and 51.005. The Debtor's credible evidence shows that the fair market value of the 40-Acre Tract at the date of foreclosure, January 5, 2010 was $2,000,000 less rollback taxes of $140,000. Grencorp attempted to get this evidence thrown out several times before and during the trial and vigorously cross examined the Debtor's expert witness. However, despite scoring some points with the expert, the testimony established a fair market value for purposes of the Texas Property Code. With respect to the Debtor $1,820,000 Note, the Debtor is entitled to an offset in the amount of $1,850,000, which is the difference between the fair market value and the $10,000 bid at the foreclosure sale. That credit does not extinguish and satisfy the

---

[1] This Court did not admit in full a writing from Grencorp regarding changing the old arrangement between the parties. This Court believes much of that writing is an offer to compromise. However, even if such writing were fully admitted and considered, there is no legal instrument evidencing any new or different arrangement.

Findings of Fact and Conclusions of Law                                                                                                   7

unsecured deficiency claim, but it does reduce the balance on the Debtor $1,820,000 Note from $2,339,479.62 to $489,479.62.

4. In pleadings, the Debtor has advanced other theories to reduce or eliminate the balances on the Debtor $1,414,000 Note and the deficiency claim. Without belaboring these findings and conclusions, the Debtor's evidence on such theories, including internal books and records of the Debtor, were not convincing. Neither did the Debtor's witnesses persuade the Court on these points. All other requests by the Debtor, including requests for declaratory relief (except for the subrogation claim discussed herein), are denied as the Debtor did not meet its burden of proof.

5. The Debtor sought a declaratory ruling regarding 20/20 Management and whether it holds a subrogation claim against the Debtor. Asserting entitlement to equitable subrogation based on funds provided to TOM Capital and applied to the $1,820,000 Loan, 20/20 Management advanced the $577,535 because it expected to receive an ownership interest in the $1,820,000 Loan. This Court previously determined that 20/20 Management did not obtain an ownership interest in the $1,820,000 Loan, but whether 20/20 Management has subrogation rights against the Debtor is a separate issue. Defendants opposed the relief, arguing that the equitable subrogation claim was not properly before the Court. The Court determined that the equitable subrogation claim had been raised in the Debtor's third cause of action in its Complaint. Over the Defendants' objections, the equitable subrogation issue was tried. The Court finds that 20/20 Management has subrogation rights that will become enforceable against the Debtor once Grencorp has been paid in full.

6. The doctrine of equitable subrogation allows a party to step into the shoes of another party,

asserting claims that it would otherwise be unable to assert, and "Texas courts interpret the doctrine liberally." *Frymire Eng'g Co., Inc. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 142 (Tex. 2008). The doctrine applies "in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter." *Id.* (quoting *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007)). Equitable subrogation has been described as a "legal fiction" that treats an extinguished obligation as if it still exists in order to benefit the third party that paid the obligation. The legal fiction allows the third party to be "substituted to the rights, remedies, and securities of another [creditor]." *Murray v. The Cadle Company,* 257 S.W.3d 291, 299 (Tex. App.–Dallas 2008). "The general purpose of equitable subrogation is to prevent unjust enrichment." *First Nat'l Bank v. O'Dell,* 856 S.W.2d 410, 415 (Tex.1993). "Texas courts are 'liberal in their determinations that payments were made involuntarily.'" *Frymire Eng'g Co., Inc.* at 145 (quoting *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 20 S.W.3d 692, 702 (Tex. 2000)).

7. The Debtor's request for declaratory relief related to 20/20 Management's subrogation claim is granted to the extent that it seeks declaration that 20/20 Management is entitled to subrogation rights against the Debtor. It was undisputed at trial that 20/20 Management made a $577,535 payment on the $1,820,000 Loan, and it was also undisputed that 20/20 Management was not obligated to pay the $1,820,000 Loan. Instead, the Debtor was obligated under the Debtor $1,820,000 Note. 20/20 Management is subrogated to the liens that continue to secure the $1,820,000 Loan. 20/20 Management made a substantial payment towards the extinguishment of the Debtor's debt. Despite 20/20 Management's

mistaken belief that the payment was for an ownership interest in the note, the Court is certain that 20/20 Management did not make this payment as a mere volunteer. To hold otherwise would allow the Debtor to be unjustly enriched to the detriment of 20/20 Management; therefore 20/20 Management is entitled to step into the shoes of TOM Capital.

8. In the event this ruling is reviewed on appeal, this Court rendered its ruling after several days of trial testimony.[2] The Debtor's and 20/20 Management's witnesses were not as convincing as the Defendants' witnesses, especially in light of the lack of documentation to support the Debtor's theories and case. The Defendants' witnesses directly contravened Debtor's theories and were more convincing. On the other hand, the Debtor's expert witness was credible on the fair market value and, interestingly, Grencorp offered no evidence to the contrary, even by way of impeachment.

### END OF ORDER ###

---

[2] The Court overruled an objection made by the Debtor's attorney with respect to a question related to the witness's prior criminal convictions. As explained to the Debtor's counsel at trial, the Court was already aware of the witness's prior convictions. They are old. The answer to the question did not affect this ruling.